B.E. Ward, a resident of Love county, Okla., died owning real estate and personal property in that county. His wife, Blanche Ward, was appointed administratrix. In the course of the administration a younger brother, J.G. Ward, of Texarkana, Ark., commenced this action to establish a trust in the real estate to the extent of one-half thereof and to recover one-half of some personal property from the administratrix.
At death B.E. Ward owned in his own name a ranch containing about 800 acres six or eight miles northwest of Marietta, and he or he and his wife *Page 553 
owned the home ranch so-called, a mile or two north of Marietta, the title standing in the name of "B.E. Ward and Blanche Ward." The personal property or estate consisted of several head of livestock, but not a large herd, and farm implements and machinery located on the home ranch, and about $3,000 on deposit in the Marietta bank in a checking account to the credit of B.E. Ward.
Plaintiff's claim was based on the contention of a general partnership alleged to cover all business activities and all bank accounts in several banks in various names, and all property acquired, and including the properties here involved which plaintiff contended were assets of the partnership.
The action of the trial court in sustaining plaintiff's contentions in full is here for review. Defendant contends the findings are not supported by the evidence and are contrary to the weight of the evidence and contrary to applicable rules of law. We must review the record.
Plaintiff asserted a full partnership from 1919 to B.E. Ward's death in 1939. There is no direct proof of a partnership. That is, there is no proof of a partnership agreement, nor a written document or even a letter referring to them as partners. There is no satisfactory proof as to any of the details of this partnership, as to its origin, as to what each put into it, or the intended sharing in profits or losses, or as to how the brothers did in fact share in the moneys during the several years involved. The proof relied upon by plaintiff consists of circumstances and statements and records of bank accounts and transactions. B.E. Ward was the oldest of four brothers and two sisters, J.G. Ward was the youngest of the six. In the year 1917 or 1918 J.G. Ward, then 16 or 18 years of age, came to live with B.E. Ward, who already owned real estate and a going business in the handling of livestock and the slaughter thereof, and a butcher shop or meat market. There is evidence that B.E. Ward had already made use of "Ward Bros." as a trade name, having been assisted in work by one or both of his other brothers. It was not long after 1918 until J.G. Ward, working for or with his brother, B.E. Ward, also had permission to write and did write checks on the "Ward Bros." bank accounts for business expenses or for his own use. And after J.G. Ward attained maturity, for a number of years, he and B.E. Ward, both living at Texarkana, Ark., dealt extensively in buying and selling cattle, using the name "Ward Bros." with various bank accounts in that name, checked on by either of them. Seemingly there was no limitation or restriction on either as to how much or for what purpose he drew checks on the several "Ward Bros." bank accounts.
At the same time each of these brothers had separate or personal bank accounts, and while each drew freely on any and all of the "Ward Bros." accounts, neither drew on the personal bank account of the other.
In the later years of his life, B.E. Ward removed to Love county, Okla., and gradually withdrew from active participation in the business at Texarkana, leaving that more and more to J.G. Ward.
Since the late 1920's the bank account of "Ward Bros." "B.E. Ward" and "J.G. Ward" had been very active. Though no large balances at any time, there were many hundreds of checks and deposits. In about the year 1933 J.G. Ward closed out his personal account and abandoned use of any "J.G. Ward" account, and thereafter operated exclusively in and through the "Ward Bros." account. B.E. Ward in the same year opened a new account in the Texarkana bank to the credit of himself and wife "or the survivor," and out of that account in the following year 1934 he opened the B.E. Ward account in the Marietta, Okla., bank which continued as his active account until his death.
Thus for a number of years these two brothers operated through joint bank *Page 554 
accounts. There was nothing whatever to show the character of their joint dealings or the details of their partnership or percentage of ownership, nothing to show that any partnership books were ever kept, or that any settlements or adjustments were ever made between them, unless they kept their books or accounts to their own satisfaction and made adjustments to their own satisfaction by and through their several bank accounts.
During those years J.G. Ward maintained several personal or individual bank accounts and so did B.E. Ward. But during all that time there was also a "Ward Bros." bank account on which each could and did check freely. In most instances there was nothing to show whether the specific check was drawn for personal expenses of one of them or for personal expenditure by one of them, or for expenditure or expense by or for the benefit of some cattle deal or business transaction. Of course, this was not true of all of the checks, as some did bear notation of the expenditure purpose, as for instance, for the purchase of cattle or the expense of handling of cattle. There were checks payable to J.G. Ward signed "Ward Bros." by B.E. Ward, also checks payable to B.E. Ward signed "Ward Bros." by J.G. Ward, which might have indicated some sort of distribution of joint or partnership funds. But the record is wholly silent as to any plan or system of any division of funds, or any distribution thereof, or of any accounting one to the other or of any balancing of accounts, unless the brothers handled that to their own satisfaction from time to time by and through their checks and their several bank accounts.
During the latter years of B.E. Ward's life he spent most of his time at his final home in Love county, Okla., looking after his properties there and engaging in cattle deals there with others as partners or joint adventurers. During that time his personal bank account in Marietta, Okla., showed many transactions of deposits and checks by himself and his wife. He also had joint account at Marietta with others with whom he made cattle purchases. During that time B.E. Ward did continue some transactions with his brother, J.G. Ward, through the "Ward Bros." account in Texarkana. But during that period J.G. Ward was more and more in charge of the Texarkana business of buying and handling cattle, and there conducting a wholesale meat business and cold storage business. It was during that period J.G. Ward ceased use of any personal bank account and conducted his operations exclusively through the "Ward Bros." account in Texarkana. Whether this was the result of diminishing personal funds or merely a desire to so operate is not shown.
It is definitely shown that during those years J.G. Ward checked on the "Ward Bros." account for himself and his family as well as for his business operations. It is also shown that during those years J.G. Ward bought several items of real estate in Texarkana and owned them until B.E. Ward died, that during that time B.E. Ward never claimed any interest in them, nor during that time was any interest therein conceded to him by J.G. Ward.
It is mainly upon these circumstances as to bank transactions and the buying and selling of cattle and the continued use of the trade name of "Ward Bros." that plaintiff's claim of an over-all partnership is based.
This proof discloses that the brothers traded together, and for all we know, as equal partners or joint adventurers, but it cannot be said the proof goes further than to show partnership of joint interest in the money and property held in the name of "Ward Bros." or "B.E. Ward and J.G. Ward."
Plaintiff's case is based on the contention that this proof goes further and shows that J.G. Ward also had an interest in all of the property of B.E. Ward, including his personal bank account, and the joint bank account of B.E. Ward and his wife. That conclusion is not justified at all as we view it. *Page 555 
All this is wholly insufficient to show that J.G. Ward had a half interest, or any interest, in the individual bank account of B.E. Ward at Marietta, Okla., at the time of his death, or in the other items of property there owned by B.E. Ward.
The dearth of convincing proof as to details, and the absence of explanation of many matters, going to the real and exact character of the relationship between the two brothers, is explained by the fact that J.G. Ward also died before final trial of this cause. Many matters which could have been made wholly clear with both alive may well remain somewhat obscure since the passing away of both. That, however, cannot weaken the settled rule fixing the burden of proof. In 47 C.J. 727, a part of the rule stated is as follows:
". . . One who alleged a partnership between himself and another must establish its existence by clear proof, especially if the other party to the agreement is dead." (Citing supporting authorities.)
That rule, which would have fully applied if J.G. Ward had survived to conduct the trial, is no less applicable when final trial is conducted by his personal representative after his death.
The plaintiff also relies on oral testimony as to oral statements made by B.E. Ward many years ago. Such character of evidence is the weakest of all evidence by agreement of substantially all the authorities as this court and others have observed.
In Mattingly v. Pennie, 105 Cal. 514, 39 P. 200, it was said:
"No weaker kind of testimony can be produced."
In Austin v. Wilcoxson, 149 Cal. 24, 84 P. 417, in considering such testimony, the court said:
"It is not stating it too strongly to say that evidence so given under such circumstances must appear to any court to be in its nature the weakest and most unsatisfactory."
And in Fagan v. Fisher, 74 Colo. 473, 222 P. 647, it was held in paragraph 3 of the syllabus as follows:
"Oral testimony of oral statements against interest made by deceased persons many years before is the weakest of all evidence."
But plaintiff contends that the method of purchase of the real estate in Love county, Okla., brands it as partnership property or property jointly and equally owned by J.G. Ward and B.E. Ward, and impresses a trust upon it in plaintiff's favor to the extent of a full one-half interest.
In Gaines Bros. Co. v. Gaines, 176 Okla. 576, 56 P.2d 869, we noted the oft-repeated rule that:
"Again this court, in the case of Babcock v. Collison et al.,73 Okla. 232, 175 P. 762, has held: 'A resulting trust may be established by parol evidence, but the law requires that the proof necessary to establish it should be of the most satisfactory kind. The onus of establishing a resulting trust rests upon him who seeks its enforcement, and before a court of equity will be warranted in making a decree therefor, the evidence must be clear, unequivocal, and decisive.' Craig v. Craig, 114 Okla. 302, 247 P. 67; Hunter v. Murphy et al.,124 Okla. 207, 255 P. 561; Lindsay v. Britt, 138 Okla. 163,280 P. 609; McGlothlin et al. v. Garner et al., 140 Okla. 227,282 P. 617; Newbern v. Farris et al., 149 Okla. 74, 299 P. 192; White et al. v. Mayo et al., 35 N.M. 430, 299 P. 1068; Anson et al. v. Anson et al., 169 Okla. 309, 36 P.2d 915; Foster v. Shirley et al., 170 Okla. 373, 40 P.2d 1083.
"The only defense in this action to the claim of the plaintiff was in effect that the funds with which the lands in question were purchased were corporation funds and that by reason thereof the title thus acquired was of necessity held in trust for the benefit of the corporation that furnished the funds for their purchase. This court has repeatedly held that in an affirmative defense, such as pleaded by the defendants in this action, it is incumbent upon the defendants to assume the burden of proof and to establish a resulting trust by the clearest, most unequivocable and decisive testimony. . . ." *Page 556 
Having in mind the guiding rule, and the contentions of the parties here, we now examine the details of the purchase and holding of the Love county land.
The home ranch, so-called, was acquired by B.E. Ward in three separate purchases. The first purchase of about 1,000 acres from Archie Robertson for $21,121.45. The second purchase of 120 acres from the York heirs for $1,200, and the third purchase of 160 acres known as the Davis land for $3,310.
The first purchase above mentioned was made by B.E. Ward in Marietta, Okla., on October 16, 1929, when he contracted to buy it from Archie Robertson, and made a down payment or a deposit in escrow in the bank at Marietta of $2,000, the balance to be paid on checking of title. The record does not show where B.E. Ward obtained the $2,000 which he then deposited. About a month later B.E. Ward paid the balance to Archie Robertson by his personal check on the Texarkana bank. B.E. Ward and J.G. Ward together withdrew about $20,000 from a joint deposit in the bank and transferred that sum to the personal account of B.E. Ward and that money was ultimately used in payment of B.E. Ward's personal check to Archie Robertson.
The second purchase above mentioned was in one deed from part of the York heirs in 1932, and another deed from the remaining York heirs in 1933. For the first deed in 1932 there was paid $130 out of the Blanche Ward personal bank account at Texarkana, and for the other deed in 1933 $1,070 out of B.E. Ward's personal account. Plaintiff admits that the aforesaid $130 was paid out of Blanche Ward's personal account, and plaintiff does not offer to show where the balance of $1,070 came from.
As to the third purchase above mentioned, the Davis land, it was paid for with $3,310 out of B.E. Ward's personal account in Marietta, Okla., and as to this Davis land plaintiff admits that "it does not show on the face of it any connection with Ward Bros."
When B.E. Ward made the aforesaid first purchase from Archie Robertsan he took the deed to "B.E. Ward and Blanche Ward" and title was taken in exactly the same way in the case of the two deeds from the York heirs and the deed to the Davis land.
As to the other item of ranch property located about six or eight miles northwest of Marietta, B.E. Ward purchased that from one Thompson on January 5, 1938, about 800 acres for $4,000. His first payment thereon of $1,000 was made by B.E. Ward's check on his personal account in the bank at Marietta. When the deal was closed, or a few days later, the balance of $3,000 was paid. No witness could testify as to exactly how that payment was made. The banker at Marietta who handled the transaction remembered that B.E. Ward left with him a check for $3,000, and that when he closed the deal he cashed that check and issued cashier's check to Thompson. The testimony on this point centered around the check produced by plaintiff as exhibit 26. It was a check for $3,000 drawn by J.G. Ward made payable to B.E. Ward and signed "Ward Bros. by J.G. Ward." From the similarity in amount and dates the banker believed that to be the check left with him by B.E. Ward and handled as aforesaid.
Plaintiff claims that each of these purchases was paid from partnership funds and that recovery of one-half thereof is justified for that reason.
Considering first the method of paying for the home ranch, we observe that no one could testify as to exactly how the first $2,000 was paid, that is, as to the source of the money. As to the balance of about $19,000, there is no question but that payment was made by B.E. Ward's personal check on his personal account, and that at or near the same time that same sum or a little more was withdrawn from a joint bank account by the joint action of B.E. *Page 557 
Ward and J.G. Ward and transferred to the personal account of B.E. Ward.
The evidence is not clear as to the ownership of the money in that joint account. It was carried in the bank to the credit of J.G. Ward in a savings account, but was restricted so that withdrawals could only be made by joint action of B.E. Ward and J.G. Ward. While this money was deposited in the name of J.G. Ward, the restriction upon withdrawal would definitely indicate it was not his money. These facts alone would or might indicate some character of joint ownership of the money, however, without indication as to the percentage of interest or ownership of each. When we consider these facts along with the detailed circumstances of the withdrawal and expenditure of this money, there is as much indication that in fact the money belonged to B.E. Ward.
The total of a little more than $20,000 was accumulated in that account between 1925 and 1929. In 1925 J.G. Ward was 20 or 21 years of age. He had then been living in the home of his older brother, B.E. Ward, for five or six years and when not engaged at school had been working for and with his brother, but there is nothing to indicate the extent or amount which he could have or did contribute to the family earnings during those years. There is some evidence that J.G. Ward had some interest in that fund or account, but there is no evidence from which to calculate his percentage of interest. On the other hand, there is ample evidence to indicate that the entire fund belonged in fact to B.E. Ward, there being evidence to indicate and explain a definite desire on his part during those particular years to have his money in such an account separate and apart from any account standing in the bank in his own name. But if we assume that S.G. Ward had some undetermined interest in that fund, or if it was at that time some character of a partnership fund, the fact remains that it was jointly withdrawn in 1929 and jointly and deliberately transferred to B.E. Ward individually. When it was then used by B.E. Ward to make the first purchase of the home ranch, we must look to the subsequent handling of the property to determine whether it was intended to buy this land for the brothers jointly, as plaintiff claims.
The selection and purchase of the land was wholly made by B.E. Ward individually. He took title in the names of "B.E. Ward and Blanche Ward" and such deed was immediately recorded. Thereafter, for ten years, until his death, he and Blanche Ward exclusively occupied and possessed the home ranch, holding themselves out as sole owners thereof and exclusively using the income therefrom. Although J.G. Ward at various times visited that ranch, he never made claim to any part ownership, no accounting was ever made to him for any rents and profits, and he never demanded any accounting or inquired as to any income therefrom.
There is evidence offered by the plaintiff as to oral statements attributed to B.E. Ward in his lifetime in which he referred to "mine and Jay's ranch in Love county," and some mortgages executed by B.E. Ward and J.G. Ward on cattle referred to as being on our ranch in Love county, Okla.
However, on the other hand, there was evidence of numerous oral statements made by J.G. Ward in his lifetime in which he referred to this portion of the Love county land as his brother's home and as belonging to B.E. Ward. Also, in some mortgages of cattle they were referred to as being located on B.E. Ward's ranch in Love county, Okla.
The record discloses that there is altogether as much oral statement reference and chattel mortgage statement reference to this property as belonging to B.E. Ward as there is such reference to any interest therein being held or owned by J.G. Ward.
When they were jointly executing a chattel mortgage on cattle, mostly if not entirely outside of Oklahoma, it was not unnatural, in 'view of all the circumstances, that the mortgage should *Page 558 
refer to the cattle as being located on our ranch in Love county, Okla.; however, as stated in some such instances, the statement was that the cattle were located on B.E. Ward's ranch in Love county.
The father died when J.G. Ward was a boy and from the age of about 16 he made his home with his older brother, B.E. Ward. There is much in the record to indicate that the relationship between these brothers was more nearly like that of father and son than a true business partnership. The circumstances could indicate a general partnership, or they could indicate a limited partnership only in the separate cattle buying instances, or they could have indicated the much closer relationship in which B.E. Ward had guided and reared Jay into a manhood of business and trading experience, with a free rem to check on the bank checking account. It will be noted, however, that this did not apply to the joint or savings account above referred to.
Upon full consideration of the record we are convinced that the true relationship was as last above stated. We are convinced that B.E. Ward fully intended to purchase this home ranch for himself and his wife Blanche, and that it was not intended by anyone that it should be purchased or held for himself and J.G. Ward. The authorities demonstrate that even if the $19,000 was in fact paid to Archie Robertson out of the joint moneys, that fact alone would not be conclusive as to the ownership of the land then or in the future.
If it be assumed that this $19,000 was jointly owned up to its withdrawal from the bank, still we must go further and consider all details of the land purchase, and the future holding and handling of the land in determining whether a trust results.
In Lyons v. Lyons, 182 Okla. 108, 76 P.2d 887, this court observed:
"Whether realty purchased with firm funds is individual or partnership property is, in the last analysis, one of fact depending upon the intention of the parties, as revealed by the use of the property, the conduct of the parties, their agreements express or implied, the manner of keeping accounts, the payment of expenses connected with ownership, the disposition made of any income from the property, and all the surrounding circumstances, the decision of every case necessarily depending on its own peculiar facts.
"This rule was recognized in the case of Cobb v. Whitney, 1927, 124 Okla. 193, 255 P. 577, 578, wherein it was held in part that 'a partner may with the consent of the other partners withdraw money from the partnership funds and invest them and acquire title to property in his own name' . . ."
As to the second purchase of a part of the home ranch, the evidence wholly fails to show that any part of the consideration was paid out of joint or partnership moneys or out of money in which J.G. Ward could have had any interest. As to those payments plaintiff rests upon the over-all contention of a permanent and all-embracing partnership by reason whereof plaintiff claims that J.G. Ward was the owner of one-half of all moneys acquired or held by B.E. Ward. And, as we have found, that contention cannot be sustained by the evidence.
As to the third purchase of the Davis land, plaintiff admits, as above stated, that there is nothing on the face of the transaction to show any connection with Ward Bros., nevertheless plaintiff claims again that the over-all partnership deals conferred on J.G. Ward the right to one-half thereof.
As to the purchase of the other tract of land referred to as the Thompson land, the most that plaintiff can claim is that B.E. Ward paid three-fourths of the consideration, or $3,000, using therefor the check referred to as exhibit 26. This is probably true, though not definitely shown. If that is wholly true, it could go no further than to show that J.G. Ward distributed to B.E. Ward $3,000 out of the Ward Bros. account, and that B.E. Ward was then using his own money when he so used that $3,000 check. Under the authorities, *Page 559 
if this $3,000, while on deposit in the Ward Bros. account, was partnership or joint money, it did not retain that character when J.G. Ward himself checked it out of that account to B.E. Ward personally. The definite presumption would be that the money then belonged personally to B.E. Ward and nothing is shown to rebut that presumption other than the over-all claim that J.G. Ward was entitled to a one-half interest in all property and money however acquired by B.E. Ward.
The bank records disclose many checks out of the Ward Bros. account made payable to J.G. Ward individually, and some like this one payable to B.E. Ward individually. The record is wholly insufficient to sustain any conclusion that such funds remained partnership funds after being so checked out to the individual brothers.
We therefore find the evidence insufficient to sustain plaintiff's contention as to the Davis land.
We should here note that in 1937 and 1939 B.E. Ward made two other land purchases in Love county, Okla. The first was a 5-acre tract near the city of Marietta, and the second a 40-acre tract a few miles away. It appears these tracts were needed and used in handling or holding cattle bought and sold by B.E. Ward and J.G. Ward. When B.E. Ward made these purchases, in each instance, he took title in the name of "B.E. Ward and J.G. Ward." This indicates that these tracts were used in and intended to be a part of the cattle business of the two brothers and separate and apart from the other two ranch properties heretofore considered. These last two tracts of land are not involved in this litigation. It apparently being conceded that they have always belonged to B.E. Ward and J.G. Ward jointly.
However, the difference in the method of taking and holding title to these different tracts of land may well indicate the difference in intention of the parties, so as to indicate that the ownership of each tract of land was in truth and in fact as it purported to be by the record title.
The shown generosity of B.E. Ward to his younger brother over a period of 20 to 25 years, and the fact that they operated extensively together with complete harmony and full trust and confidence, thoroughly precludes the thought that B.E. Ward could have intended to take from his younger brother and enrich himself. And in view of the complete knowledge which each always had as to the affairs of the other, it is beyond belief that J.G. Ward was without any knowledge of the fact that B.E. Ward had taken title to the home ranch in the name of "B.E. Ward and Blanche Ward," and had claimed exclusive ownership thereof for ten years before his death; or that J.G. Ward was without knowledge that B.E. Ward had taken title to the Thompson land in the name of "B.E. Ward" with claim of exclusive ownership for the year and a half before he died.
We conclude the evidence relied on by plaintiff does not approach the fixed requirement of law as to verity of proof, and that the findings and judgment are clearly against the weight of the evidence. After reviewing the record we conclude it to be our duty to leave the title to these properties as the parties themselves fixed and held the titles.
Therefore the judgment appealed from is reversed, and the cause remanded, with direction to render judgment for defendant.
RILEY, BAYLESS, CORN, and ARNOLD, JJ., concur. GIBSON, C. J., HURST, V. C. J., and OSBORN and DAVISON, JJ., dissent.